BART H. WILLIAMS (State Bar No. 134009)
bart.williams@mto.com
DANIEL P. COLLINS (State Bar No. 139164)
daniel.collins@mto.com
AMELIA SARGENT (State Bar No. 280243)
amelia.sargent@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

JOSHUA PATASHNIK (State Bar No. 295120)
joshua.patashnik@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105-2907
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

Attorneys for Defendants WELLS FARGO & CO.
and WELLS FARGO BANK, N.A.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>            Plaintiff,<br><br>      vs.<br><br>WELLS FARGO & CO., and WELLS FARGO BANK, N.A.,<br><br>            Defendants. | Case No. CV-14-09751-ODW(RZx)<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS**<br><br>Judge: Hon. Otis D. Wright II<br>Date: March 23, 2015<br>Time: 1:30 P.M.<br>Ctrm.: #11, 312 N. Spring St. |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND .............................................................................. 3

    I.    Allegations of the City Attorney's Complaint ...................................... 3

        A.    Wells Fargo's Allegedly Discriminatory Subprime Lending .................................................................................... 3

        B.    Allegations Concerning Wells Fargo's Post-2008 Lending ........ 4

        C.    The City Attorney's UCL Claim ................................................. 8

STANDARDS GOVERNING MOTIONS TO DISMISS ................................. 8

ARGUMENT ...................................................................................................... 9

    I.    The Action Should Be Dismissed Due to Improper Claim-Splitting ............................................................................................... 9

        A.    The City Attorney Has Engaged in Improper Claim-Splitting ...................................................................................... 9

        B.    The Proper Remedy for the City Attorney's Claim-Splitting Is a Dismissal With Prejudice .................................. 10

    II.    The UCL Claim is Barred by the UCL's Statute of Limitations ........ 13

        A.    California's Continuing Violation Doctrine Does Not Apply to the UCL Claim Asserted Here .................................. 15

        B.    The City Attorney Has Failed to State a Claim That Would Be Viable Under the Continuous Accrual Doctrine ...... 16

CONCLUSION .................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Adams v. California Dep't of Health Servs.*,
    487 F.3d 684, 688 (9th Cir. 2007) ........................................................*passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................... 8, 18

*Barron v. Reich*,
    13 F.3d 1370 (9th Cir. 1994) ..................................................................... 9

*Beaver v. Tasardia Hotels*,
    29 F. Supp. 2d 1294 (S.D. Cal. 2014) ...................................................... 14

*Bell Atl. Co. v. Twombly*,
    550 U.S. 544 (2007) ...................................................... 8, 17, 18, 19

*Cabrera v. Alvarez*,
    977 F. Supp. 2d 969 (N.D. Cal. 2013) ..................................................... 19

*California v. Bank of America Corp.*,
    No. CV-14-9744-PA(AGRx),
    2015 U.S. Dist. LEXIS 12699 (C.D. Cal. Feb. 2, 2015) ........................*passim*

*City of Los Angeles v. Wells Fargo*,
    22 F. Supp. 3d 1047 (C.D. Cal. 2014) .................................................. 2, 13

*DC Comics v. Pacific Pictures Corp.*,
    938 F. Supp. 2d 941 (C.D. Cal. 2013) ............................................ 15, 16, 17

*Gamble v. City of Escondido*,
    104 F.3d 300 (9th Cir. 1997) ................................................................... 18

*Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*,
    545 U.S. 308 (2005) .................................................... 1, 2, 11, 12

*Lippitt v. Raymond James Fin. Svcs.*,
    340 F.3d 1033 (9th Cir. 2003) ................................................................ 12

*McDonald v. Coldwell Banker*,
    543 F.3d 498 (9th Cir. 2008) ............................................................ 18, 19

*National R.R. Passenger Corp. v. Morgan*,
    536 U.S. 101 (2002) ................................................................................. 3

*Nevada v. Bank of America Corp.*,
    672 F.3d 661 (9th Cir. 2012) .................................................................. 12

*O'Donovan v. CashCall, Inc.*,
    No. 08-3174-MEJ, 2012 WL 2568174 (N.D. Cal. July 2, 2012) .................. 14

*Taylor v. Sturgell*,
    553 U.S. 880 (2008) ................................................................................. 9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................. 9

- ii -

## STATE CASES

*Aryeh v. Canon Bus. Solutions, Inc.*,
  55 Cal. 4th 1185 (2013) ..................................................... 2, 3, 15, 16, 17

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
  20 Cal. 4th 163 (1999) ........................................................................ 14

*Cortez v. Purolator Air Filtration Prods. Co.*,
  23 Cal. 4th 163 (2000) ........................................................................ 14

*Rose v. Bank of America, N.A.*,
  57 Cal. 4th 390 (2013) .................................................................... 2, 14

## FEDERAL STATUTES

28 U.S.C. § 1367(a) ................................................................... 2, 11, 12

42 U.S.C. § 3601 ............................................................................... 1

42 U.S.C. § 3613(a)(1)(A) ................................................................... 1

Pub. L. No. 110-289, 122 Stat. 2654 (2008) ............................................ 4

## STATE STATUTES

Cal. Bus. & Prof. Code § 17200 ...................................................... 1, 13

Cal. Bus. & Prof. Code § 17204 ...................................................... 8, 15

Cal. Bus. & Prof. Code § 17206 ........................................................... 8

Cal. Bus. & Prof. Code § 17208 .......................................................... 14

## FEDERAL RULES AND REGULATIONS

Fed. R. Civ. P. 12(b)(6) .................................................................... 8

24 C.F.R. § 203.17 ........................................................................... 5

24 C.F.R. § 203.21 ........................................................................... 5

24 C.F.R. § 203.22 ........................................................................... 5

24 C.F.R. § 203.24 ........................................................................... 5

24 C.F.R. § 203.27 ........................................................................... 6

38 C.F.R. § 36.4310 .......................................................................... 5

38 C.F.R. § 36.4311 .......................................................................... 5

38 C.F.R. § 36.4313 .......................................................................... 6

## OTHER AUTHORITIES

Robert B. Avery, et al., *The Mortgage Market in 2011:
  Highlights from the Data Reported under the Home
  Mortgage Disclosure Act*, Fed. Res. Bull., Vol. 98, No. 6 (Dec. 2012),
  available at <http://www.federalreserve.gov/pubs/bulletin/
  2012/pdf/2011_HMDA.pdf> .............................................................. 6

Stern, CAL. PRAC. GUIDE: BUS. & PROF. CODE § 17200
  PRAC. (The Rutter Group 2012) ........................................................ 14

**INTRODUCTION**

This lawsuit is the second suit filed against Defendants Wells Fargo & Co. and Wells Fargo, N.A. (collectively, "Wells Fargo") by the City Attorney of the City of Los Angeles based on nearly identical allegations concerning alleged violations of the Federal Fair Housing Act, 42 U.S.C. § 3601, *et seq.* ("FHA"). In the first suit (Case No. CV-13-9007), the City Attorney sued on behalf of the City as an "aggrieved person" seeking damages and injunctive relief under section 813 of the FHA, 42 U.S.C. § 3613(a)(1)(A). In this second action (Case No. CV-14-9751), the City Attorney brings suit on behalf of the "People of the State of California" seeking injunctive relief and civil penalties under the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*. ("UCL"). For two reasons, the City Attorney's second Complaint ("2d Compl." or "Complaint") should be dismissed with prejudice.

First, by failing to assert in a *single* action all of the claims of the City and its privies based on the same alleged conduct of Wells Fargo, the City Attorney has engaged in impermissible claim-splitting, as Judge Anderson recently found in dismissing a comparable duplicative action against Bank of America. *See California v. Bank of America Corp.*, No. CV-14-9744-PA(AGRx), 2015 U.S. Dist. LEXIS 12699 (C.D. Cal. Feb. 2, 2015).

Wells Fargo, however, respectfully disagrees with Judge Anderson's further conclusion that the Court lacks jurisdiction over the City Attorney's UCL claim, as well as with his conclusion that the appropriate remedy for the City Attorney's improper claim-splitting is a dismissal *without* prejudice so that the claim can be re-filed in state court. Because the UCL claim here is *exclusively* based on the same alleged *federal* FHA violations as are alleged in the City Attorney's first Complaint, the UCL claim falls within the federal-question jurisdiction that the Supreme Court has recognized "over federal issues embedded in state-law claims between nondiverse parties" in *Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*, 545

- 1 -

U.S. 308, 314 (2005).  Moreover, because the separate complaints in federal court were improper and should have been a single action, the UCL claim also falls within this Court's supplemental jurisdiction over pendent state-law claims under 28 U.S.C. § 1367(a).  With respect to the City Attorney's improper claim-splitting, Judge Anderson's remedy—dismissal without prejudice to re-filing in state court—does nothing to cure that procedural violation, but instead makes it *worse*, by even more sharply splitting the claims into separate actions in separate courts.  The Court should instead dismiss the UCL claim with prejudice in view of the largely duplicative nature of the two complaints and the wholly unjustified nature of the City Attorney's actions.

Second, the Complaint should be dismissed because it fails to state sufficient facts to establish that the City Attorney has complied with the distinctive *state* statute of limitations that applies to UCL claims.  In addressing the statute of limitations, the City Attorney starts from the mistaken premise that "the operative statute of limitations" here is the one "governing actions brought pursuant to the Federal Fair Housing Act" (2d Compl., ¶ 143) and that the statute-of-limitations analysis for the UCL claim is therefore supposedly identical to that applied by this Court in the City Attorney's first suit against Wells Fargo, Case No. CV-13-9007.  *See City of Los Angeles v. Wells Fargo*, 22 F. Supp. 3d 1047 (C.D. Cal. 2014) (holding that the allegations were sufficient under the FHA's continuing-violations doctrine).  The City Attorney's premise is wrong as a matter of law.  A "UCL action does not 'enforce' the law on which a claim of unlawful business practice is based," but instead "provides its own distinct and limited equitable remedies for unlawful business practices, using other laws *only to define what is 'unlawful.'*"  *Rose v. Bank of America, N.A.*, 57 Cal. 4th 390, 396-97 (2013) (emphasis added).  The UCL has its own statute of limitations, and the California Supreme Court's standards for applying the "continuing violations" doctrine under the UCL are different from those that this Court applied under the FHA.  *See Aryeh v. Canon Bus. Solutions,*

- 2 -

*Inc.*, 55 Cal. 4th 1185, 1197-98 (2013) (explicitly adopting, and applying to the UCL, the continuing-violations standards set forth in *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)).  The City Attorney's allegations are inadequate under *Aryeh*, and the UCL claim is untimely as a matter of law and should be dismissed with prejudice.

## FACTUAL BACKGROUND

### I.    Allegations of the City Attorney's Complaint

The allegations against Wells Fargo in the City Attorney's second Complaint on behalf of the "People" are largely copied verbatim from the City Attorney's first Complaint filed on behalf of the City itself.  (Declaration of Daniel P. Collins ("Collins Decl."), Ex. J (redline comparing the complaints in Nos. CV-13-9007 and CV-14-9751).)  As a result, the City Attorney here relies on nearly identical allegations concerning the same alleged underlying violations of the FHA as were alleged in the first Complaint.  Specifically, the City Attorney alleges the same asserted FHA violations with respect to (1) alleged discriminatory "subprime" lending from 2004-2008; and (2) alleged discriminatory lending after 2008 with respect to loans guaranteed by the U.S. Federal Housing Administration ("USFHA") and the Department of Veterans Affairs ("VA").  The primary difference between the two Complaints is that the City Attorney has deleted nearly all of the allegations about the alleged *consequences* of the asserted FHA violations, such as alleged increased foreclosures, reduced tax revenues, and increased municipal expenses. (Collins Decl., Ex. J at 119-28.)  Instead, the City Attorney focuses directly on the alleged discriminatory loan originations and seeks only injunctive relief and civil penalties under the UCL for these alleged discriminatory lending decisions.

### A.    Wells Fargo's Allegedly Discriminatory Subprime Lending

As with the first Complaint, the vast bulk of the City Attorney's second Complaint is focused on Well Fargo's alleged discrimination in originating so-called "subprime" loans between 2004 and 2008.  The second Complaint specifically notes

- 3 -

1   that "Wells Fargo stopped originating subprime loans from its wholesale channel *in*

2   *July 2007*" (2d Compl., ¶ 58, emphasis added), and concedes that "[s]ince 2008, ….

3   [t]he Bank shifted from offering new subprime loans." (*Id.*, ¶ 33.) Thus, in

4   describing the alleged underlying details of Wells Fargo's asserted discriminatory

5   lending, the overwhelming majority of the second Complaint's allegations are

6   expressly tied to "subprime" lending (*id.*, ¶¶ 7-9, 23-32, 34-47, 58, 63-67, 73-86) or

7   to the approximately 2004-2008 time frame in which subprime lending occurred

8   (*id.*, ¶¶ 30, 40, 59, 67, 73-75, 79-82). The second Complaint alleges that, as a result

9   of these practices, a nationwide U.S. Department of Justice analysis claimed that

10   "African-American and Hispanic borrowers remained more likely to receive

11   subprime loans from 2004 to 2008 than similarly-situated whites." (*Id.*, ¶ 73.) The

12   second Complaint alleges that a report issued by the "California Reinvestment

13   Coalition" in February 2010—nearly five years before this Complaint was filed—

14   revealed this alleged pattern of discriminatory subprime lending. (*Id.*, ¶ 67.)

15       **B.    Allegations Concerning Wells Fargo's Post-2008 Lending**

16       As in the first Complaint, a handful of paragraphs in the City Attorney's

17   second Complaint allege discriminatory lending in connection with the federal

18   government's USFHA and VA loan programs.

19       The second Complaint alleges that after the "subprime meltdown" in 2008,

20   "underwriting tightened for all loans" across all lenders, including Wells Fargo, with

21   the result that "conventional credit" was "restricted." (2d Compl., ¶¶ 67, 70, *see also*

22   *id.*, ¶¶ 43, 103, 132-33.) There is no allegation that the new lending standards were

23   applied differently to minority borrowers than to non-minority borrowers.

24       The Government responded to the tightening of underwriting by significantly

25   expanding the availability of loans guaranteed by the USFHA in the "FHA

26   Modernization Act of 2008," a title of Pub. L. No. 110-289, § 2101, *et seq.*, 122

27   Stat. 2654, 2830 (2008). As a result, after 2008, "FHA lending has shot up." (2d

28   Compl., ¶ 70.) The second Complaint alleges that Wells Fargo likewise began to

- 4 -

1   issue more USFHA loans and other government-backed loans (such as VA loans).

2   The City Attorney also alleges that, after 2008, Wells Fargo began issuing "more

3   Home Equity Lines of Credit ('HELOCs')" (*id.*, ¶ 68), but the second Complaint

4   contains no further allegations about such loans.

5        In contrast to pre-2008 subprime loans, which the City Attorney characterizes

6   as "predatory" (2d Compl., ¶ 130), the second Complaint concedes that USFHA and

7   VA loans are *not* "inherently predatory."  (*Id.*, ¶ 33, n.9; *id.*, ¶ 68, n.15.)  The City

8   Attorney's concession that USFHA loans are not predatory is unsurprising, because

9   the Government's rules prohibit nearly all of the features that paragraph 130 of the

10  Complaint defines as "predatory."  USFHA and VA fixed-rate loans are fully

11  amortizing and do not allow "interest-only" terms, *see* 24 C.F.R. §§ 203.17(c)(2),

12  203.21, 203.24(a); 38 C.F.R. § 36.4310(b), or loans with balloon payment features,

13  *see* 24 C.F.R. § 203.21; 38 C.F.R. § 36.4310(a).  USFHA and VA loans prohibit

14  pre-payment penalties, *see* 24 C.F.R. § 203.22(b); 38 C.F.R. § 36.4311, and home

15  purchasers must fully document income and assets.  (Collins Decl. Exs. A-I

16  (attaching relevant excerpts from HUD Manuals for USFHA loan program and the

17  VA Lender's Handbook).)[1]  ARMs with "teaser rates," defined in paragraph 130 of

18  the Complaint as loans with rates that can increase by more than 6% over the life of

19  the loan, are prohibited.  (Collins Decl., Ex. E.)  Instead, the second Complaint

20  alleges that USFHA and VA loans are "characterized as higher risk loans" because

21  of two *potential* features:  (1) they are "typically more expensive for a borrower than

22  conventional loans" because they "include fees and costs not associated with

23  conventional loans"; and (2) "several of the government loan programs permit

24  negative amortization."  (*Id.*, ¶ 33.)  However, the second Complaint does *not* allege

25  ───────────────

[1] *See* HUD 4155.2 3.A.2.c (except in rare cases, "FHA does not permit either prepayment

26  penalties or due-on-sale clauses"); HUD 4155.1 1.B.1 (required documentation for loan
application); VA Pamphlet 26-7, Chapter 4-2 (required documentation for income), Chapter 4-4

27  (required documentation for assets); HUD 4155.1 6.B.2.a (rate adjustment on ARMs is capped at
either 5% or 6%); HUD 4155.1 6.B.3.j (ARMs must "be fully-amortizing"); VA Pamphlet 26-7,

28  Chapter 3-9(a) ("[a]ll VA loans must be amortized if the maturity date is beyond 5 years from the
date of the loan.").

- 5 -

1  that Wells Fargo has issued *any* USFHA or VA loans that actually have negative

2  amortization, much less that it has done so in a manner that violates the FHA.

3  Rather, the Complaint's allegation that USFHA and VA loans are "higher risk" rests

4  solely on the allegation that such loans are "more expensive" because they include

5  "fees and costs not associated with conventional loans." (*Id.*; *see also id.*, ¶ 68

6  (repeating the general allegations of paragraph 33, and applying them to Wells

7  Fargo, but omitting any reference to negative amortization and relying solely on the

8  higher fees and costs of USFHA and VA loans).)[2]

9      One of the few new paragraphs in the City Attorney's second Complaint

10  addresses precisely this issue and elaborates on the basis for the allegation that

11  USFHA and VA loans involve distinctive fees and costs. (2d Compl., ¶ 68.)

12  According to the second Complaint, Wells Fargo's website confirms that

13  USFHA/VA loans are more expensive because "[y]ou typically have to pay upfront

14  and monthly FHA mortgage insurance premiums" and "[y]ou typically have to pay a

15  one-time VA funding fee that can be financed into the loan amount." (*Id.* (internal

16  quotation marks omitted).) The distinctive "fees and costs" associated with USFHA

17  and VA loans thus are obviously not predatory; rather they are *government-imposed*

18  insurance premiums and funding fees. (*See* 24 C.F.R. § 203.27; 38 C.F.R.

19  § 36.4313; Collins Decl. Ex. B (HUD 4155.2, Chapter 7).) The Government—not

20  Wells Fargo—imposes these fees and costs on USFHA and VA loans in light of the

---

21  [2] The second Complaint notes, in a footnote, that USFHA loans may also have "higher interest
22  rates" (2d Compl., ¶ 68, n.15), but it does not allege that the USFHA/FHA loans issued by Wells
     Fargo actually had higher interest rates; it alleges only that they had higher costs and fees. Indeed,
     the Federal Reserve study cited in paragraph 64 (and footnote 12) of the Complaint addresses the
23   subject of high-interest rate loans and states that "in almost all cases, nonconventional [*i.e.*,
     government-insured] loans have a *lower incidence of higher-priced lending* than do comparable
24   conventional loan products." Robert B. Avery, et al., *The Mortgage Market in 2011: Highlights
     from the Data Reported under the Home Mortgage Disclosure Act*, Fed. Res. Bull., Dec. 2012, at
25   22 (emphasis added), <http://www.federalreserve.gov/pubs/bulletin/2012/ >. Thus, to raise a
     plausible inference that Wells Fargo was discriminatorily issuing *higher interest-rate* USFHA or
26   VA loans, the second Complaint would need to have included additional factual allegations to
     support an inference that Wells Fargo's USFHA/VHA loans *differed* in that respect from the
27   overall pattern of USFHA or VA loans, and in addition that higher-rate loans were
     discriminatorily issued to minority borrowers. The second Complaint contains no such
28   allegations.

- 6 -

countervailing *favorable* features these loans offer to borrowers.  Thus, unlike conventional loans, which typically require a 20% or greater downpayment to avoid costly private mortgage insurance, USFHA loans require only *3.5%* down—thereby making loans available to many people who, despite good credit, may not qualify for conventional financing.  (Collins Decl. Ex. D (HUD 4155.1 2.A.2.a).)  Similarly, the VA explains that the required "funding fee" it imposes "reduces the loan's cost to taxpayers *considering that a VA loan requires no down payment and has no monthly mortgage insurance*."  *See Loan Fees–Home Loans*, U.S. Dep't of Veterans Affairs (Feb. 9, 2015), <http://www.benefits.va.gov/homeloans/purchaseco_loan_fee.asp> (emphasis added); *see also* VA Lender's Handbook, Chapter 8-1(a)-(b), Chapter 8-2(a)-(d) (Collins Decl., Ex. I at 70-75).[3]

The second Complaint alleges that a statistical analysis purportedly shows that, between 2009-2012, African-American and Latino borrowers in Los Angeles were more likely to receive government-backed loans from Wells Fargo than white borrowers.  (2d Compl., ¶ 141.)  However, the City does *not* allege that this analysis shows a statistically significant difference between otherwise equally creditworthy persons of different races *who put the same amount down*; on the contrary, the second Complaint says only that it controlled for factors "such as ratio of loan amount to income."  (*Id.*)  The City Attorney thus does not allege that its statistical analysis controlled for the most critical difference between USFHA/VA loans and conventional loans.

Moreover, in contrast to its detailed allegations concerning subprime lending, which address the alleged effect of particular asserted practices such as loan officer and broker compensation, lending discretion, and internal controls, the second

---

[3] The second Complaint mentions that an employee who worked at Wells Fargo from 2010-2011 thought that FHA loans and "small loans (*e.g.*, less than $100,000)" typically had "higher costs," including "more points," but there are no allegations as to whether the perceived use of higher points was associated with the "small loans" or with a desire to obtain a lower interest rate or whether the point/rate options for USFHA loans were different than for conventional loans.  (2d Compl., ¶¶ 93, 129.)

1   Complaint does not identify any specific business practices of Wells Fargo with

2   respect to its origination of USFHA or VA loans that it contends violated the FHA.

3   Likewise, of its six "confidential witnesses," only two (CW2 and CW5) worked in

4   Los Angeles after 2010, and neither of those two alleged any discriminatory conduct

5   in connection with USFHA or VA loans.  (2d Compl., ¶¶ 88, 90, 92, 94, 104, 118-

6   19, 129.)

7        **C.    The City Attorney's UCL Claim**

8        The City Attorney filed this suit on December 19, 2014.  The time to seek

9   leave to amend the complaint in the first action (Case No. CV-13-9007) was not set

10  to expire until December 29, 2014, which was 10 days after the second Complaint

11  was filed.  As described above, the City alleges that Wells Fargo's alleged

12  discriminatory lending violated the FHA and therefore constitutes an "unlawful"

13  business practice under the UCL.  (2d Compl., ¶¶ 145, 149.)  The City Attorney

14  seeks injunctive relief and civil penalties under the UCL.  (*Id.*, Prayer for Relief,

15  ¶¶ A, B.)  *See* Cal. Bus. & Prof. Code §§ 17204, 17206.

16       **STANDARDS GOVERNING MOTIONS TO DISMISS**

17       To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint

18  must contain "enough facts to state a claim to relief that is plausible on its face."

19  *Bell Atl. Co. v. Twombly*, 550 U.S. 544, 570 (2007).  A plaintiff meets this standard

20  only if it "pleads factual content that allows the court to draw the reasonable

21  inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*,

22  556 U.S. 662, 678 (2009).  "Factual allegations must be enough to raise a right to

23  relief above the speculative level."  *Twombly*, 550 U.S. at 555 (citations and internal

24  quotation marks omitted).  Of course, "the tenet that a court must accept as true all

25  of the allegations contained in a complaint is inapplicable to legal conclusions."

26  *Iqbal*, 556 U.S. at 678.

27       As with any motion to dismiss, the Court may properly consider materials that

28  the City itself references in the Complaint as well as materials that are subject to

- 8 -

1  judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322

2  (2007); *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994).

3  **ARGUMENT**

4  **I.    The Action Should Be Dismissed Due to Improper Claim-Splitting**

5  **A.    The City Attorney Has Engaged in Improper Claim-Splitting**

6  "Plaintiffs generally have 'no right to maintain two separate actions involving

7  the same subject matter at the same time in the same court and against the same

8  defendant.'" *Adams v. California Dep't of Health Servs.*, 487 F.3d 684, 688 (9th

9  Cir. 2007), *overruled on other grounds*, *Taylor v. Sturgell*, 553 U.S. 880, 904

10  (2008). The test for determining whether the same Plaintiffs are engaged in

11  impermissible claim-splitting is determined by "borrow[ing] from the test for claim

12  preclusion." *Adams*, 487 F.3d at 688. As Judge Anderson recently concluded in

13  addressing the City Attorney's comparable UCL action against Bank of America,

14  the City Attorney's second Complaint constitutes impermissible claim-splitting

15  under these standards. *Bank of America*, 2015 U.S. Dist. LEXIS 12699, at *6-9.

16  Whether a second action constitutes claim-splitting turns on "whether the

17  causes of action and relief sought, as well as the parties or privies to the action, are

18  the same." *Adams*, 487 F.3d at 689; *Bank of America*, 2015 U.S. Dist. LEXIS

19  12699, at *7. Whether the causes of action and relief are the same is determined by

20  borrowing from the "transaction test" used in the claim-preclusion context. Under

21  that test, the court considers four factors: "'(1) whether rights or interests

22  established in the prior judgment would be destroyed or impaired by prosecution in

23  the second action; (2) whether substantially the same evidence is presented in the

24  two actions; (3) whether the two suits involve infringement of the same right; and

25  (4) whether the two suits arise out of the same transactional nucleus of facts.'"

26  *Adams*, 487 F.3d at 689; *Bank of America*, 2015 U.S. Dist. LEXIS 12699, at *8. As

27  Judge Anderson concluded, "all four factors are easily satisfied" here: "An

28  examination of the allegations contained in the operative Complaints filed in the two

1   actions discloses that the facts alleged are nearly identical, both allege

2   discrimination arising out of the provision of home loans and related services within

3   the identical area, and are being prosecuted by the same city official."  2015 U.S.

4   Dist. LEXIS 12699, at *8.  Case No. CV-13-9007 and Case No. CV-14-9751

5   "therefore allege identical causes of action."  *Id*.  As to whether the "parties or

6   privies to the action" are the same, *Adams*, 487 F.3d at 689, Judge Anderson

7   correctly concluded that, "at least in this factual circumstance, the People, as the

8   putative named plaintiff in [the second case] are in privity with the City."  2015 U.S.

9   Dist. LEXIS 12699 at *8.  Accordingly, the City Attorney "has engaged in

10  impermissible claimsplitting."  *Id*. at *9.

11

12  **B.    The Proper Remedy for the City Attorney's Claim-Splitting Is a Dismissal With Prejudice**

13         When confronted with unwarranted claim-splitting, the Court has discretion

14  "to dismiss the second action with prejudice" or, alternatively, "to dismiss [the]

15  later-filed complaint without prejudice, to consolidate the two actions, or to stay or

16  enjoin proceedings."  *Adams*, 487 F.3d at 692.  In affirming a dismissal with

17  prejudice of an improper second suit in *Adams*, the Ninth Circuit noted that the

18  second suit was an attempt to evade the district court's time limits on amending the

19  complaint in the first action; that the factual basis for the second suit was known to

20  the plaintiff at the time the first suit was filed; and that there was no justification

21  (such as newly changed facts) for filing the second suit.  *Id*. at 692-93.  These

22  considerations weigh in favor of a dismissal with prejudice here.

23         There is no apparent reason why the City Attorney could not have sought to

24  amend the complaint in Case No. CV-13-9007 so as to include the new UCL claim

25  on behalf of the People.  Indeed, had the City Attorney done so, the jurisdictional

26  issue that troubled Judge Anderson would have been entirely eliminated.  Under the

27  supplemental jurisdiction statute, this Court's federal-question jurisdiction over the

28  City's FHA claims in Case No. CV-13-9007 indisputably gives the Court

- 10 -

"supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  Given the duplicative nature of the claims, both factually and legally, and the privity of the parties, there can be no doubt that the cases "form part of the same case or controversy" under Article III.  Moreover, because the factual allegations are essentially the same, the City Attorney was obviously aware of them when the first Complaint was filed, and he likewise was undoubtedly aware of his ability to attempt to assert a UCL action on behalf of the People based on those same facts.  *See Adams*, 487 F.3d at 693.  The City Attorney's actions are all the more unjustifiable because the time to seek leave to amend the complaint in Case No. 13-9007 was not set to expire until December 29, 2014, which was 10 days *after* the second Complaint was filed.  The simplest and most appropriate course of action, both jurisdictionally and procedurally, would have been to seek leave to amend the complaint in Case No. CV-13-9007.  But the City Attorney unjustifiably failed to do so.

Instead, the City Attorney unnecessarily filed an entirely separate action, invoking the narrow scope of federal-question jurisdiction that the Supreme Court has recognized "over federal issues embedded in state-law claims between nondiverse parties" in *Grable*, 545 U.S. at  314.  While Wells Fargo agrees with the City Attorney that *Grable* creates federal-question jurisdiction here, that theory of subject-matter jurisdiction is not as clear-cut as the undeniable and readily available jurisdiction presented by the supplemental-jurisdiction statute—as illustrated by Judge Anderson's rejection of the City Attorney's *Grable* theory.  *Bank of America*, 2015 U.S. Dist. LEXIS, at *3-6.[4]  The only plausible explanation for the City

---

[4] Wells Fargo respectfully submits that Judge Anderson was wrong in concluding that *Grable* does not create federal jurisdiction over the City Attorney's UCL claim.  Under *Grable*, there is federal-question jurisdiction over a *state-law* cause of action if the "state law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial

- 11 -

Attorney's unusual course of action here is related to the one found by Judge

Anderson in the *Bank of America* litigation.  Noting that the deadline for amending

the complaint in the *City of Los Angeles v. Bank of America* case had already

expired when the separate UCL action against Bank of America was filed, Judge

Anderson found that the City Attorney had "engaged in impermissible claim-

splitting in an effort to avoid the deadlines" set in *City of Los Angeles v. Bank of*

*America*.  *See Bank of America*, 2015 U.S. Dist. LEXIS 12699, at *6.  Although the

City Attorney did not face the same impediment here—because the deadline to seek

leave to amend had not yet expired in *City of Los Angeles v. Wells Fargo*—the City

Attorney apparently did not want to take the revealing step of filing amended

complaints in the various actions pending before this Court, while filing a *separate*

UCL *only* against Bank of America before Judge Anderson.  That would have made

blatantly obvious that the City Attorney was trying to evade Judge Anderson's

scheduling order.  Thus, the City Attorney's otherwise inexplicable decision to

unnecessarily file a separate UCL action against Wells Fargo makes sense only as

part of an effort to avoid highlighting the City Attorney's effort to evade Judge

Anderson's deadlines in the *Bank of America* litigation.  Because the unjustifiable

responsibilities."  545 U.S. at 314.  Here, the resolution of the federal-law FHA issues *are* necessary to the resolution of the UCL claim, because they are the *sole* predicate for that claim. (2d Compl., ¶ 149.)  *Cf. Lippitt v. Raymond James Fin. Svcs.*, 340 F.3d 1033, 1043 (9th Cir. 2003) (remanding to state court because UCL claim, as pleaded, was supported by other "unfair" or "fraudulent" conduct).  Moreover, those federal-law issues are "disputed and substantial," and are the subject of vigorous litigation in Case No. CV-13-9007.  They bear no resemblance to the "glancing reference to federal law" that the Ninth Circuit held was insufficient to create a "substantial" federal issue in *Nevada v. Bank of America Corp.*, 672 F.3d 661, 675 (9th Cir. 2012) (rejecting invocation of *Grable* in a suit in which federal law played only a limited role as one of several "alternative and independent theories").  As to the final *Grable* factor, Judge Anderson was rightly concerned that an *indiscriminate* application of *Grable* to every UCL claim based on a federal-law violation would not be "'"consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331."'"  *Bank of America*, 2015 U.S. Dist. LEXIS 12699, at *3 (quoting *Nevada v. Bank of America*, 672 F.3d at 675, in turn quoting *Grable*, 545 U.S. at 313).  But what Judge Anderson overlooked is that *this* action *is* consistent with congressional judgment about what belongs in federal court *because it could have and should have been brought in Case No. CV-13-9007 under the supplemental jurisdiction statute.*  Indeed, because the two actions were *improperly* split, federal jurisdiction can also be upheld on the alternative theory that the two actions should be considered as if they were a single action for jurisdictional purposes, such that supplemental jurisdiction exists directly under § 1367(a).

- 12 -

1   claim-splitting in this case appears to have been a tactical choice that was part of an

2   effort to help evade a court deadline in another case, that factor weighs in favor of

3   dismissal with prejudice here.  *Cf. Adams*, 487 F.3d at 687-88 (district court did not

4   abuse its discretion in considering that plaintiff's claim-splitting was an effort to

5   evade court orders concerning timeliness of amendment of complaint in first action).

6        In all events, the remedy chosen by Judge Anderson in the *Bank of America*

7   litigation is *not* the appropriate one and should not be adopted here.  The Ninth

8   Circuit stated in *Adams* that the remedy for claim-splitting should aim to fulfill the

9   purposes of that doctrine, which are to "promote[] judicial economy and the

10  'comprehensive disposition of litigation.'"  487 F.3d at 692.  Far from fulfilling

11  those goals, Judge Anderson's remedy—a dismissal without prejudice to re-filing in

12  state court—undermines judicial economy by allowing the City Attorney to engage

13  in an even more inefficient form of claim-splitting, namely, the maintenance of

14  duplicative separate actions in two different court systems.

15  **II.     The UCL Claim is Barred by the UCL's Statute of Limitations**

16       The City Attorney's second Complaint wrongly assumes that the "operative

17  statute of limitations" for its UCL claim is the *federal* statute of limitations that is

18  applicable to the predicate FHA violation on which the UCL claim is based (2d

19  Compl., ¶ 143), and that the statute-of-limitations analysis for the UCL claim is

20  therefore the same as that applied by this Court in upholding the timeliness of the

21  City Attorney's first Complaint.  *See City of Los Angeles v. Wells Fargo*, 22

22  F. Supp. 3d at 1058-59.  This assumption is wrong as a matter of law.  Because the

23  City Attorney has failed to plead sufficient facts to satisfy the standards that apply to

24  the continuing violations doctrine under the *UCL's* statute of limitations, the UCL

25  claim should be dismissed as untimely.

26       The UCL prohibits "any unlawful, unfair, or fraudulent business act or

27  practice."  Cal. Bus. & Prof. Code § 17200.  "By proscribing 'any unlawful'

28  business practice," the UCL "borrows violations of other laws and treats them as

- 13 -

unlawful practices that the unfair competition law makes independently actionable." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).  While "borrow[ing] the violation of other laws" provides the *substantive* standard against which unlawfulness is judged for claims premised on the "unlawful" prong of the UCL, the UCL itself supplies the remaining elements for the "independent[]" actions it creates.  As the California Supreme Court has explained, the UCL "provides its own distinct and limited equitable remedies for unlawful business practices, using other laws *only* to define what is 'unlawful.'" *Rose*, 57 Cal. 4th at 397 (emphasis added).  The UCL also has its own four-year statute of limitations, commencing on the date the cause of action accrues.  Cal. Bus. & Prof. Code § 17208.  Accordingly, the UCL's statute of limitations applies to the UCL cause of action here, except to the extent that federal law provides a *stricter* statute of limitations that would preclude application of the UCL's statute of limitations.  *See Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 178-79 (2000) (UCL's own statute of limitations applies to action under "unlawful" prong even if predicate violation is based on state statute with a shorter limitations period); *O'Donovan v. CashCall, Inc.*, No. 08-3174-MEJ, 2012 WL 2568174 (N.D. Cal. July 2, 2012) ("'[N]otwithstanding *Cortez* and the rule that the longer (four-year) limitations period of Section 17208 applies when borrowing a violation of a statute carrying a shorter limitations period, the result may be different when the claim at issue is federal and the federal law supplies a shorter limitations period.'") (quoting STERN, CAL. PRAC. GUIDE: BUS. & PROF. CODE § 17200 PRAC., ¶ 5:292.1 (The Rutter Group 2012)); *see also Beaver v. Tasardia Hotels*, 29 F. Supp. 3d 1294, 1304 (S.D. Cal. 2014) (noting a division of authority as to whether the *Cortez* rule applies to a federal predicate with a shorter statute of limitations).[5]

---

[5] Because, as Wells Fargo explains, the City Attorney's UCL claim is time-barred under the UCL's own statute of limitations, this Court has no occasion to address whether a *stricter* federal rule should instead be applied here.

Whether the City's UCL claim is timely turns on the UCL's standards for applying that doctrine, not the FHA's (except, as noted earlier, to the extent that the FHA's standards are stricter).  In discussing "continuing-wrong accrual principles" under the UCL and California common law, the California Supreme Court has held that "[t]here are two main branches, the continuing violation doctrine and the theory of continuous accrual."  *Aryeh*, 55 Cal. 4th at 1197; *id.* at 1196 (holding that the UCL is "governed by common law accrual rules" to the same extent as any other California statute).  The UCL claim here is untimely under both doctrines.

### A.    California's Continuing Violation Doctrine Does Not Apply to the UCL Claim Asserted Here

As the California Supreme Court explained in *Aryeh*, the continuing violation doctrine applies when a person suffers injuries that "are the product of a series of small harms, any one of which may not be actionable on its own," and there is therefore an "inability to identify with certainty when harm has occurred or has risen to a level sufficient to warrant action."  55 Cal. 4th at 1197-98.  Accordingly, the continuing violation doctrine applies "'where there is no *single incident* that can fairly or realistically be identified as the cause of significant harm.'"  *DC Comics v. Pacific Pictures Corp.*, 938 F. Supp. 2d 941, 949 (C.D. Cal. 2013) (Wright, J.) (emphasis in original).  The continuing violation doctrine is inapplicable here under these standards.[6]

The City Attorney's second Complaint refutes the applicability of the continuing violations doctrine on its face.  The theory of the City Attorney's UCL

---

[6] As an initial matter, it is questionable whether the continuing violations doctrine can be invoked at all in a *public* enforcement action under the UCL.  As noted, the rationale for the application of the continuing violation doctrine rests on the uncertainty concerning when the *injury* necessary to bring suit has occurred, *see Aryeh*, 55 Cal. 4th at 1197-98, but a public enforcement action under the UCL does *not* require the showing of injury that is required in a common-law action or in a private suit under the UCL.  *See* Cal. Bus. & Prof. Code § 17204 (*private* action under the UCL requires a showing that the plaintiff has "suffered injury in fact and has lost money or property as a result of the unfair competition").  In any event, even assuming *arguendo* that the continuing violations doctrine may be invoked in a public enforcement action, the City Attorney's UCL claim in this case does not meet the requirements for the application of that doctrine here.

- 15 -

1 claim is that "each discriminatory loan issued" is a *separate* violation of the UCL.

2 (2d Compl., ¶ 15.)  Because the Complaint itself alleges "a series of discrete,

3 independently actionable alleged wrongs," California's continuing violation doctrine

4 is inapplicable as a matter of law here under *Aryeh*.  55 Cal. 4th at 1198.  This Court

5 reached a similar conclusion in *DC Comics*.  Noting that the plaintiff's tortious

6 interference claim was based on multiple "overt acts of repudiation for which DC

7 could have filed suit," the Court held that California's continuing violation doctrine

8 was inapplicable.  938 F. Supp. 2d at 950.  Following *Aryeh*'s standards, the Court

9 ruled that the plaintiff's "harm was not the result of small harms that may not have

10 been actionable on their own.  Rather, each was an independently actionable act.

11 The continuing-violation doctrine therefore cannot apply here."  *Id.*  The same is

12 true under the allegations as framed by the City Attorney's own Complaint.

13      "Nor is this a case in which a wrongful course of conduct became apparent

14 only through the accumulation of a series of harms."  *Aryeh*, 55 Cal. 4th at 1198.

15 Once again, the Court need look no further than the second Complaint itself.  The

16 Complaint alleges that a *February 2010* report by the "California Reinvestment

17 Coalition" documented the alleged pattern of discriminatory subprime-mortgage

18 lending that is the gravamen of the City Attorney's Complaint.  (2d Compl., ¶ 67.)

19 Because the City Attorney was thus on notice of the alleged claims well more than

20 four years before this suit was filed in December 2014, the application of the

21 continuing violations doctrine cannot be sustained on the ground that the City

22 Attorney had not had sufficient time to recognize that a series of acts that "'might

23 not be individually actionable'" only became actionable as "'part of a pattern.'"

24 *Aryeh*, 55 Cal. 4th at 1198.  Accordingly, this Court should "reject[] the continuing

25 violation doctrine's application" here.  *Id.*

26     **B.**    **The City Attorney Has Failed to State a Claim That Would Be**

27         **Viable Under the Continuous Accrual Doctrine**

28     Under the continuous accrual doctrine, "the expiration of the limitations

- 16 -

period following a first breach of duty or instance of misconduct" is not "sufficient to bar suit for any subsequent breach or misconduct." *Aryeh*, 55 Cal. 4th at 1198. Instead, "'[w]hen an obligation or liability arises on a recurring basis, a cause of action accrues each time a wrongful act occurs, triggering a new limitations period.'" *Id.* at 1199 (citation omitted). Each separate breach is treated "as an independently actionable wrong with its own time limit for recovery.'" *Id.*; *see also DC Comics*, 938 F. Supp. 2d at 949. However, "the theory of continuous accrual supports recovery only for damages arising from those breaches falling within the limitations period." *Aryeh*, 55 Cal. 4th at 1199.

Accordingly, even assuming that the continuous accrual doctrine could be invoked by the City Attorney here, all claims based on loan originations outside the UCL's four-year statute of limitations are time-barred. *Id.* at 1199; *see also DC Comics*, 938 F. Supp. 2d at 949. As a result, any UCL claim based on loan originations occurring before December 19, 2010 is untimely—meaning that the vast bulk of the City Attorney's second Complaint (including *all* allegations concerning subprime lending) is time-barred. And in order to state a UCL claim that would be timely under a continuous accrual theory, the City Attorney must allege facts to plausibly establish an "independently actionable" wrongful act of discriminatory lending, in violation of the FHA, *after* December 19, 2010. The second Complaint fails to do so.

The second Complaint contains no allegations that plausibly establish an independently actionable FHA violation after December 19, 2010. As explained earlier, for the period after 2008, the second Complaint relies on generalized allegations about loans under the Government's USFHA and VA loan programs. *See supra* at 4-8. But the few facts alleged concerning such lending are too vague and conclusory and are insufficient to "raise a right to relief above the speculative level" for the purposes of a UCL claim. *Twombly*, 550 U.S. at 555. The City Attorney claims that Wells Fargo's USFHA and VA loans after 2010 were "higher

- 17 -

1   risk" loans, but the only features that the second Complaint identifies as creating

2   that "higher risk" are *Government-imposed* "fees and costs not associated with

3   conventional loans." (2d Compl., ¶ 68.) Loan features that are imposed by federal

4   law cannot be said to be predatory (as the City Attorney concedes (*id.*, ¶ 68 n.15)),

5   nor can they be said to violate the FHA or the UCL.

6       The City Attorney also alleges that Wells Fargo "disproportionately issued"

7   more USFHA and VA loans to "African-American and Latino borrowers in Los

8   Angeles from 2009-2012" (2d Compl., ¶ 141), but this conclusory allegation is

9   insufficient under *Iqbal* and *Twombly*. To state a claim under the FHA, a plaintiff

10   must plead facts establishing, *inter alia*, that the defendant treated *similarly situated*

11   persons of different races differently. *See McDonald v. Coldwell Banker*, 543 F.3d

12   498, 505-06 (9th Cir. 2008) (disparate treatment theory); *Gamble v. City of*

13   *Escondido*, 104 F.3d 300, 306-07 (9th Cir. 1997) (disparate impact theory). The

14   second Complaint conspicuously fails to do so. Although a critical feature that

15   distinguishes USFHA and VA loans from conventional loans is the *reduced*

16   *downpayment required*, the City Attorney does *not* allege that his statistical analysis

17   controlled for this critical variable. That is, the second Complaint does *not* allege

18   that Wells Fargo issued disproportionately more USFHA and VA loans to minority

19   borrowers than to white borrowers who are paying similar percentage

20   downpayments. Instead, the second Complaint alleges only that the City Attorney

21   controlled for "borrower race and objective risk characteristics *such as ratio of loan*

22   *amount to income*." (2d Compl., ¶ 141, emphasis added.)

23       The Complaint's other alleged "statistical" analyses are likewise insufficient

24   to establish that discriminatory originations in violation of the UCL occurred within

25   the limitations period. These studies purport to show *aggregate* patterns over the

26   time period from "2004-2011." (2d Compl., ¶¶ 131, 132, 138.) But barely one year

27   of that eight-year time frame is within the limitations period, and it cannot logically

28   or plausibly be inferred from an eight-year statistical pattern that the same statistical

- 18 -

1   results would obtain in the narrower window that consists *only* of the last year.

2   These allegations therefore do not "raise a right to relief above the speculative

3   level." *Twombly*, 550 U.S. at 555.  Because the second Complaint thus fails to plead

4   facts plausibly establishing that similarly situated persons were treated differently

5   with respect to USFHA and VA lending, it fails to allege any actionable violation of

6   the UCL within the statute of limitations.  *See Cabrera v. Alvarez*, 977 F. Supp. 2d

7   969, 975-77 (N.D. Cal. 2013).

8          Moreover, to state a claim under a disparate *treatment* theory, the City

9   Attorney would have to allege facts raising a plausible inference of *intentional*

10  discrimination.  *McDonald*, 543 F.3d at 505 n.7.  Because Plaintiffs have failed to

11  show that similarly situated persons were treated differently, no inference of

12  discriminatory intent can arise on that basis.  Nor do the second Complaint's

13  allegations from so-called "Confidential Witnesses" give rise to an inference of

14  discriminatory treatment by Wells Fargo in the City of Los Angeles.  Only CW2 and

15  CW5 worked in Los Angeles within the statutory period after December 2010, with

16  CW5 working from 2010-2011 and CW2 working from 2009-2012.  (2d Compl.,

17  ¶¶ 89, 93.)  The only allegations from CW5 in the second Complaint concern

18  commissions to loan consultants and the higher costs allegedly associated with FHA

19  loans (*id.*, ¶¶ 104, 129); neither allegation says anything at all about differential

20  treatment, much less discriminatory intent.  Likewise, CW2 merely alleges that "he

21  believed minorities were hit particularly hard" by the stricter lending guidelines that

22  were applied after the financial crisis (*id.*, ¶ 119), but he did not say, much less

23  provide facts plausibly showing, either that the stricter guidelines were applied

24  differently to similarly situated minority borrowers or that Wells Fargo acted with

25  discriminatory intent.

26          Because the second Complaint fails to allege any actionable instances of

27  discriminatory lending within the UCL's four-year limitations period, it fails to state

28  a viable claim under the continuous accrual theory.

- 19 -

## CONCLUSION

For the foregoing reasons, this action should be dismissed with prejudice.

DATED:  February 10, 2015                MUNGER, TOLLES & OLSON LLP

By:_____/s/ *Daniel P. Collins*____
Daniel P. Collins

Attorneys for Defendants
WELLS FARGO & CO. and WELLS
FARGO BANK, N.A.

- 20 -